**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

NATIONAL STAR ROUTE MAIL
CONTRACTORS ASSOCIATION, INC.,

    Plaintiff

    v.

UNITED STATES POSTAL SERVICE,

    Defendant

Civil Action No. 16-2350 (CKK)

**MEMORANDUM OPINION**
(December 19, 2016)

This case arises out of the U.S. Postal Service's incipient efforts to comply with an arbitration decision and award that resolved a grievance by the American Postal Workers Union relating to the Postal Service's award of private contracts for transport of the mail without prior notice to the Union. Having found that the Postal Service had engaged in willful, "wholesale and repeated violations of its obligations" to the Union under the Collective Bargaining Agreement, the arbitrator ordered the Postal Service to convert the 110 disputed routes (or other routes as agreed to with the Union) to routes to be staffed by Union members; the arbitration award allows the Postal Service six months, or until February 18, 2017, which can be extended by agreement, to complete this conversion. *U.S. Postal Serv. v. Am. Postal Workers Union, AFL-CIO*, Case No. Q06C-4Q-C 11182451, at *16, 20 (Aug. 18, 2016) (Das, Arb.) ("Arbitration Award").[1]

---

[1] Numerous copies of the Arbitration Award have been filed in this case. For simplicity and clarity, the Court shall cite directly to the Arbitration Award, identical copies of which have been filed as Exhibit 1 to Plaintiff's Complaint, ECF No. [1-1]; Exhibit 1, Attachment B to Plaintiff's Motion for Temporary Restraining Order and Preliminary Injunction, ECF No. [6-1]; and Exhibit 1, Attachment A to the Postal Service's Opposition to Plaintiff's Motion for Temporary Restraining Order and Preliminary Injunction and Motion to Dismiss Plaintiff's Complaint, ECF No. [13-2].

Among the contracts addressed in the Arbitration Award are those held by members of the National Star Route Mail Contractors Association ("Plaintiff" or "Plaintiff Association"). On November 30, 2016, Plaintiff initiated this action and on December 2, 2016, requested expedited hearing upon its Motion for Temporary Restraining Order and Preliminary Injunction. Plaintiff seeks declaratory and injunctive relief to prevent the Postal Service "from taking any action to implement the portion of the August 18, 2016[,] arbitration award that directs the Postal Service to Terminate up to 110 highway mail transportation routes currently served by contractors so that the routes may be served by Postal Service employees." Pl. Mot. for TRO & PI at 1.

Before the Court are Plaintiff's [6] Motion for Temporary Restraining Order and Preliminary Injunction and the [14] Motion to Dismiss by Defendant United States Postal Service ("USPS" or "Postal Service"), in which [15] Intervenor American Postal Workers Union AFL-CIO ("APWU" or "Union") joins. Defendant Postal Service has submitted its Motion to Dismiss simultaneously with its [13] Opposition to Plaintiff's Motion for Temporary Restraining Order and Preliminary Injunction and relies on the same Memorandum of Points and Authorities to support both its Opposition and its Motion to Dismiss. Intervenor APWU similarly relies on the same arguments and authorities in support of its joinder in Defendant Postal Service's Motion to Dismiss as in its [11] Opposition to Plaintiff's Motion. Also before the Court is Plaintiff's [16] Reply in support of its Motion for Temporary Restraining Order and Preliminary Injunction. While captioned by Plaintiff solely as a "reply," the Court also considers it as Plaintiff's opposition to Defendant's Motion to Dismiss; Plaintiff addresses the jurisdictional and other substantive arguments that Defendant and Intervenor submit in support of their Motion to Dismiss, and the Court further notes that during the Status Hearing held by teleconference on December 5, 2016, the Court also raised jurisdictional questions and requested, in particular, that

the parties address the justiciability questions of standing and ripeness in their briefing. The Court, in an exercise of its discretion, does not find it necessary to call for a reply from Defendant or Intervenor in further support of Defendant's Motion to Dismiss and deems both Plaintiff's Motion for Temporary Restraining Order and Preliminary Injunction and Defendant's Motion to Dismiss and Intervenor's joinder therein fully briefed and ripe for adjudication.

Upon consideration of the pleadings,[2] the relevant legal authorities, and the record as a whole, the Court GRANTS Defendant's [14] and Intervenor's [15] Motion to Dismiss and DENIES Plaintiff's [6] Motion for Temporary Restraining Order and Preliminary Injunction. The Court finds that it lacks subject matter jurisdiction over this matter. First, Plaintiff lacks standing to bring these claims, which are not yet ripe for adjudication. Additionally, to the extent that these claims may be brought at some future time, jurisdiction is vested in the United States Court of Federal Claims. Lacking jurisdiction over the matter, the Court does not address Plaintiff's

---

[2] The Court's consideration has focused on the following documents:
- Plaintiff's Complaint ("Compl."), ECF No. [1] and Plaintiff's Corrected Complaint ("Corr. Compl."), ECF No. [4] (when referencing the Complaint itself, the Court shall refer to the Corrected Complaint, ECF No. [4], but when referencing the exhibits, the court shall refer to the attachments and exhibits included with the original Complaint, ECF No. [1]);
- Plaintiff's Motion for Temporary Restraining Order and Preliminary Injunction, ("Pl.'s TRO & PI), ECF No. [6];
- Defendant United States Postal Service's Opposition to Plaintiff's Motion for Temporary Restraining Order and Preliminary Injunction and Motion to Dismiss Plaintiff's Complaint ("USPS Opp'n), ECF No. [13]; and
- Intervenor American Postal Workers Union's Memorandum of Law in Opposition to Plaintiff's Motion for Temporary Restraining Order and Preliminary Injunction ("Union Opp'n), ECF No. [11]; and
- Plaintiff's Reply ("Pl.'s Reply"), ECF No. [16].

In an exercise of its discretion, the Court finds that holding oral argument in this action would not be of assistance in rendering a decision.  *See* LCvR 7(f).

Motion for Temporary Restraining Order and Preliminary Injunction on the merits, as it lacks the authority to grant such relief.

Accordingly, the Court shall DISMISS this action in its entirety as follows: Plaintiff's claims are hereby dismissed WITH PREJUDICE in this court for lack of subject matter jurisdiction under the Contract Disputes Act; on this record, Plaintiff's claims as to contracts held by contractors who are *not* members of Plaintiff Association are dismissed WITH PREJUDICE for lack of standing; Plaintiff's claims, however, are dismissed WITHOUT PREJUDICE, insofar as Plaintiff shall not be barred by this Order from seeking relief in the proper forum should Plaintiff be able to establish standing in the future if its claims become ripe for adjudication; and finally the Court shall DENY WITH PREJUDICE in this court Plaintiff's Motion for Temporary Restraining Order and Preliminary Injunction, but Plaintiff shall not be barred by this Order from seeking such relief in the appropriate forum.

## I.  BACKGROUND

Because Plaintiff's claims arise out of the Postal Service's initial considerations of how it will implement the Arbitration Award, the Court shall only briefly set out the history that led up to the Arbitration Award. It is important, nonetheless, to begin with the general framework of the Postal Service's relationship with the two separate groups that provide mail transportation services, background facts upon which both parties agree.

Throughout its history, the Postal Service has relied upon both private contractors and postal employees to fulfill its mission of delivering the mail. Routes serviced by private contractors are called Highway Contract Routes ("HCR"), and Plaintiff is an association that represents certain HCR contract holders. Corr. Compl. ¶¶ 4, 11. Routes serviced by postal employees are referred to as Postal Vehicle Service ("PVS") routes. Corr. Compl. ¶ 12. The

Postal Reorganization Act ("PRA" or "Act") specifically provides for HCR contracts,

authorizing the Postal Service to obtain mail transportation services "by contract from any

person or carrier . . . under such terms and conditions as it deems appropriate." 39 U.S.C. §

5005(a)(3). The Act further provides that such HCR contracts are to be awarded for a term no

longer than four years (unless deemed "advisable or appropriate" by the Postal Service) and only

"after advertising a sufficient time previously for proposals" to allow for a competitive bidding

process. *Id.* at § 5005(b)(1). Furthermore, in determining whether to service a particular route by

HCR or PVS, the Postal Service "shall use the mode of transportation which best serves the

public interest, due consideration being given to the cost of the transportation service under each

mode." *Id.* at § 5005(c). The standard terms incorporated into HCR contracts, including those

implicated in this matter, contain provisions that allow for termination for convenience or

termination upon notice. *See* Corr. Compl. ¶ 25. *See also* USPS Opp'n at 3; *Id.* at Ex. 2, Att. A

*17; *Id.* at Ex. 2, Att. B *28; *Id.* at Ex. 2, Att. E *30; *Id.* at Ex. 2, Att. F *27. On the record before

the Court, no contracts addressed by the Arbitration Award require the Postal Service to provide

cause before terminating an HCR contract. Rather, as long as the Postal Service provides the

required notice, which the parties submit is typically a period of sixty days, it is permitted to

exercise its bargained-for right under the contract to terminate an HCR contract without

indemnification or penalty. *See* Pl. Mot. TRO & PI at 15; Pl. Reply at 14.

Drivers on PVS routes are members of the American Postal Workers Union, Corr.

Compl. ¶ 12, and their labor relationship with the Postal Service is governed by the Collective

Bargaining Agreement, entered into by the Union and the Postal Service and referred to as the

National Agreement. *See* Union Opp'n, Ex.1. The National Agreement includes provisions by

which the Postal Service must abide—in addition to the statutory provisions of the Postal

Reorganization Act—when determining whether to designate routes for service by HCR

contracts or PVS. Article 32.2.A of the National Agreement echoes § 5005(c) of the Postal

Reorganization Act and reads:

> The American Postal Workers Union, AFL-CIO, and the United States Postal
> Service recognize the importance of service to the public and cost to the Postal
> Service in selecting the proper mode for the highway movement of mail. In
> selecting the means to provide such transportation the Postal Service will give due
> consideration to public interest, cost, efficiency, availability of equipment, and
> qualification of employees.

Arbitration Award at *4. The National Agreement also stands to assure the Union an opportunity

to participate in the bidding process before the Postal Service awards private contracts through

its "Notice Requirements," set out in Article 32.2.B and C. *See* Arbitration Award at *4-5. Under

these provisions, the Postal Service must provide the Union, at the National level, with at least

sixty days' notice and specified information before renewing or installing a new HCR contract

for any route; during that period, the Union has a guaranteed opportunity to submit a bid for the

particular route and participate in a meeting with the Postal Service to discuss the route. *Id.* If the

Union requests a meeting regarding a route that the Postal Service is considering contracting out

for HCR service, the National Agreement unambiguously provides that "[a]t no time will the

subject highway contract(s) for which a meeting has been requested be awarded prior to the

actual meeting." *Id.* at *5 (quoting National Agreement, Article 32.2.B).

In 2011, the Union filed a grievance pursuant to the National Agreement, seeking

adjudication of its claims of widespread violation of the Notice Requirements by the Postal

Service. The arbitrator found—as alleged by the Union and not disputed by the Postal Service—

that "during 2010 and in subsequent years, [the Postal Service] engaged in wholesale and

repeated violations of its obligations not to award HCR contract[s]" *before* providing the Union

with notice and an opportunity to submit a competing bid. Arbitration Award at *16. Nor did the

Postal Service "offer[ ] an explanation for why it failed to comply with Article 32.2.B or to take effective corrective action even after the filing of this National grievance in 2011." *Id.* at *16. Furthermore, the arbitrator found unpersuasive the Postal Service's argument that because it ultimately provided the Union with the notice and information required, albeit *after* the HCR contracts had been awarded, the Union was nonetheless given an adequate opportunity to submit bids for these routes. The arbitrator concluded, rather, that "discussion and review and consideration by the Postal Service of the factors in Article 32.2.A <u>after</u> a service contract has been let cannot be presumed to be equivalent to the procedure the National Agreement provides for and, critically, is not what the parties bargained for." *Id*. at *17 (emphasis in original). The arbitrator further noted that the Postal Service's violation of its contractual obligations under the National Agreement "is not limited to the 212 cited violations[3] that occurred in 2010." *Id.* at *19. Furthermore, the Postal Service's repeated and willful disregard of the Notice Requirements was not, in the arbitrator's view, mitigated by his finding that "there is little likelihood, as a general matter, that even if the Postal Service had provided timely notice and otherwise followed the procedures mandated by Article 32.2.B the Postal Service would have retrieved the HCR work at issue for performance by the bargaining unit rather than renewing the contracts." *Id.* at *18.

In the Arbitration Award, issued August 18, 2016, the arbitrator characterized the Postal Service's notice violation as "extraordinary," demonstrating "widespread and repeated disregard for the requirement of timely notice," and requiring a remedy "related to and proportional to the harm—as best it can be determined—to the Union and the bargaining unit." *Id.* at *17-18. The arbitrator determined that a mere cease and desist order was indeed necessary, but alone, would

---

[3] By the time the Arbitration Award was issued, only 110 of the original 212 contracts were still operative. Since then, the number has further diminished to 102. *See* Arbitration Award at *19; Corr. Compl. ¶ 1.

be inadequate. *Id.* at *17. On the other hand, he determined that to award the Union the money

damages that it sought would not be "appropriate or justified." *Id.* at *19. Rather, the arbitrator

imposed a multi-part award, beginning with imposing a cease and desist order "directing the

Postal Service to comply with the notice and procedural provisions of Article 32.2.B before it

awards an HCR contract." *Id.* at *19, 20. The Award further orders that:

> (1) Within six months of the date of this Award (unless otherwise agreed), the
>     Postal Service shall convert 110 (or whatever number there continue to be)
>     disputed routes remaining in service (out of the 212 cited violations) to PVS
>     service for a four-year period.
> (2) By agreement, the parties may substitute other route(s) to be converted to PVS
>     service pursuant to this order based on particular circumstances.
> (3) I retain jurisdiction to resolve any matters relating to implementation of this
>     remedy.

*Id.* at *20. Two aspects of this remedy are of particular import to the Court's consideration of

Plaintiff's claims and request that this Court enjoin the Postal Service from taking any action to

implement it.

First, the remedy is most appropriately understood as ordering rescission of the HCR

contracts that were improperly awarded, and second, the remedy provides the Postal Service

wide latitude in determining how best to comply with the order.[4] The Award affords to the Postal

Service flexibility in determining what routes are best suited to conversion from HCR to PVS

routes; it does not require that the 110 routes identified in the grievance that remained in service

be converted, but rather required that that number of routes be converted to PVS routes.

Furthermore, the parties may extend the deadline for conversion upon agreement, and may bring

---

[4] In the Court's Minute Order of December 7, 2016, in this matter, it asked the parties to address
whether either took the position that this Arbitration Award should be construed as a sanction.
Just as all other requests for briefing by the Court, this question was not meant to indicate to the
parties that the Court was inclined to construe the Award as such. Having further considered the
briefing by the parties, the record in its entirety, and the relevant legal authorities, the Court does
not view the Award as a sanction.

the matter back to the arbitrator for resolution of any issues, as necessary. This Award restores the Postal Service and the Union to *status quo ante*, affording the Union its bargained-for opportunity to bid for a route before an HCR contract has already been awarded. Rather than rigidly require that the particular HCR routes before the arbitrator be converted, the Award implicitly acknowledges that conversion of some or all of these routes might not be feasible or prudent and contemplates negotiation between the Postal Service and the Union in order to both redress the harms to the Union and allow for the efficient and appropriate transport of the mail. The flexibility of this award is critical. It affords the Postal Service an opportunity to examine its route assignments and design the proper combination of HCR and PVS routes that best serves the public interest. Rather than undertake this complex analysis, the Arbitration Award rather presumes that the Postal Service will comply with the requirements of § 5005 of the Postal Reorganization Act and the related provisions of the National Agreement.

In the approximately four months that have elapsed since the issuance of the Arbitration Award, the Postal Service has taken no final actions to implement the award. The Postal Service chose not to seek to vacate the Arbitration Award. Pl. Mot. TRO & PI, Ex. 1, Att. F ("Marshall Letter"). The Postal Service provisionally identified 102 HCR routes under consideration for termination, a list of which it shared with Plaintiff. Pl. Mot. TRO & PI, Ex. 1, ¶15 ("Maraney Decl."). Among the contracts provisionally identified, twenty-seven are held by members of Plaintiff Association. *Id.* ¶ 16. The Postal Service, however, has not finalized its determination of what HCR routes will be converted; rather, it "has determined that approximately half of the routes on the list may not [be] feasible to convert to PVS. The status of these routes and whether the routes will be substituted with others are currently under negotiation with the APWU." USPS Opp'n, Ex 1, ¶ 11 ("Dean Decl."). Whether members of Plaintiff Association hold the contracts

for any of the routes still under consideration for termination cannot be ascertained from the record before the Court. Nor is the record developed as to the factors that the Postal Service is considering in assessing which contracts may be terminated, but it is presumed, and the Arbitration Award contemplates, that the Postal Reorganization Act's § 5005 considerations will be applied.

In sum, as of this date negotiations between the Postal Service and the Union appear to be ongoing. It appears that no HCR contracts have yet been identified for certain termination, and the Postal Service has not sent any notices of termination to any HCR contractors (and, therefore, no members of Plaintiff Organization have received notice that their contracts will be terminated). Finally, as of this date, no HCR contracts have been terminated for the purposes of conversion to PVS service.

## II. LEGAL STANDARD

When a motion to dismiss a complaint under Rule 12(b)(1) is filed, a federal court is required to ensure that it has "the 'statutory or constitutional power to adjudicate [the] case[.]'" *Morrow v. United States*, 723 F. Supp. 2d 71, 77 (D.D.C. 2010) (emphasis omitted) (quoting *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 89 (1998)). "Federal courts are courts of limited jurisdiction" and can adjudicate only those cases or controversies entrusted to them by the Constitution or an Act of Congress. *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994). "In an attempt to give meaning to Article III's case-or-controversy requirement, the courts have developed a series of principles termed 'justiciability doctrines,'" including the doctrines of standing and ripeness." *Nat'l Treasury Emps. Union v. United States*, 101 F.3d 1423, 1427 (D.C. Cir. 1996) (citing *Allen v. Wright*, 468 U.S. 737, 750 (1984)). The Court begins with the presumption that it does not have subject matter jurisdiction over a case, *id.,* and

Plaintiff bears the burden of establishing otherwise, *Moms Against Mercury v. FDA*, 483 F.3d 824, 828 (D.C. Cir. 2007). Furthermore, "Courts may 'choose among threshold grounds for denying audience to a case on the merits.'" *Fisher-Cal Indus., Inc. v. U.S.*, 747 F.3d 899, 903 (D.C. Cir. 2014) (quoting *Ruhrgas AG v. Marathon Oil Co.*, 526 U.S. 574 (1999)).

In determining whether there is jurisdiction, the Court may "consider the complaint supplemented by undisputed facts evidenced in the record, or the complaint supplemented by undisputed facts plus the court's resolution of disputed facts." *Coal. for Underground Expansion v. Mineta*, 333 F.3d 193, 198 (D.C. Cir. 2003) (internal citation and quotation marks omitted). "Although a court must accept as true all factual allegations contained in the complaint when reviewing a motion to dismiss pursuant to Rule 12(b)(1)," the factual allegations in the complaint "will bear closer scrutiny in resolving a 12(b)(1) motion than in resolving a 12(b)(6) motion for failure to state a claim." *Wright v. Foreign Serv. Grievance Bd.*, 503 F. Supp. 2d 163, 170 (D.D.C. 2007) (internal citation and quotation marks omitted).

### III. DISCUSSION

#### A. Justiciability

"Article III of the Constitution limits the 'judicial power' of the United States to the resolution of 'cases' and 'controversies.'" *Valley Forge Christian Coll. v. Ams. United for Separation of Church & State, Inc.*, 454 U.S. 464, 471 (1982). "In order to establish the existence of a case or controversy within the meaning of Article III, [a] party must meet certain constitutional minima," including "the requirement that . . . it has standing to bring the action." *Gettman v. DEA*, 290 F.3d 430, 433 (D.C. Cir. 2002). The "irreducible constitutional minimum" of standing requires: (1) an injury in fact; (2) causation; and (3) redressability. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992). Plaintiff has failed to meet its burden in establishing that

it has met the minimum requirements of standing for two independent reasons: first, Plaintiff

does not have representational standing with respect to the majority of contracts that it seeks to

bar the Postal Service from terminating in this action; additionally, Plaintiff has not established

injury in fact, as the harms it seeks to prevent are still too speculative, rendering the claims

unripe for adjudication. For the reasons set out *infra*, the Court accordingly finds that Plaintiff's

claims are not justiciable and the Court therefore lacks subject matter jurisdiction over them.

### 1.   Representational Standing of Plaintiff Association

Plaintiff brings this action on behalf of its member contractors, whose HCR contracts, it

alleges, have been identified for termination by the Postal Service. Plaintiff is a non-profit

corporation that "represents and advocates for its members, who are individuals and private

companies that provide mail transportation services to the Postal Service under Highway

Contract Route ("HCR") contracts." Corr. Compl. ¶ 4. In this action, Plaintiff asks this Court to

enjoin the Postal Service from "taking any action to implement the portion of the August 18,

2016[,] arbitration award that directs the Postal Service to Terminate up to 110 highway mail

transportation routes currently served by contractors so that the routes may be served by Postal

Service employees," Pl. Mot. for TRO & PI at 1. Among the contracts that Plaintiff seeks to

protect from termination are the 102 HCR contracts that the Postal Service provisionally

identified. Corr. Compl. ¶ 1. *See also* Maraney Decl. ¶ 15; Pl. Mot. TRO & PI, Ex. 1, Att. C.

Plaintiff further alleges that the termination of these contracts will impact "more than 70

individuals and small businesses," which "will lose revenue totaling more than $57 million

annually." Pl. Mot. TRO & PI at 3. Plaintiff conclusorily asserts representational standing to bring this action on behalf of its members.[5] Corr. Compl. ¶ 5.

While not specifically addressed by either Defendant or Intervenor, the Court examines at the outset Plaintiff's claim of representational standing. The standing requirement applies to all of the claims that Plaintiff brings before this Court, and "[t]ruly jurisdictional rules 'govern "a court's adjudicatory authority,"' obligating courts to 'consider *sua sponte* issues that the parties have disclaimed or have not presented.'" *United States ex rel. Heath v. AT & T, Inc.*, 791 F.3d 112, 120 (D.C. Cir. 2015) (quoting *Gonzalez v. Thaler*, — U.S. —, 132 S. Ct. 641, 648 (2012)). *See also Dominguez v. UAL Corporation*, 666 F.3d 1359, 1361-62 (D.C. Cir. 2012).

It is well settled that an association or organization may bring claims on behalf of its members if it meets certain threshold requirements (see discussion *infra*), but here Plaintiff's claims go beyond those of its members, and Plaintiff attempts to bring before this Court claims related to contracts held by non-member HCR contractors. Of these 102 routes that the Postal Service has provisionally identified for termination, only twenty-seven are serviced by contractors who are members of Plaintiff Association. Maraney Decl. ¶ 16. *See also* Pl. Mot. TRO & PI, Ex. 1, Att. D. Therefore, although Plaintiff asks the Court to enjoin the Postal Service from terminating all 102 provisionally identified contracts, seventy-five of those contracts are held by contractors who are *not* members of the Plaintiff Association.

---

[5] Plaintiff does not assert organizational standing and has not alleged "such a personal stake in the outcome of the controversy as to warrant the invocation of federal jurisdiction; that is . . . that it has suffered injury in fact, including [s]uch concrete and demonstrable injury to the organization's activities—with [a] consequent drain on the organization's resources— constitut[ing] . . . more than simply a setback to the organization's abstract social interests." *Nat'l Ass'n of Home Builders v. E.P.A.*, 667 F.3d 6, 11 (D.C. Cir. 2011) (internal citation and quotation marks omitted) (alterations in original). Accordingly, the Court shall not address this alternate basis for standing.

In order to establish representational standing, an organization must show that "'(a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit.'" *Nat'l Ass'n of Home Builders v. E.P.A.*, 667 F.3d 6, 11 (D.C. Cir. 2011) (quoting *Ass'n of Flight Attendants-CWA v. U.S. Dep't of Transp.*, 564 F.3d 462, 464 (D.C. Cir. 2009) (citations omitted)). *See also Intn'l Union, United Auto., Aerospace and Agric. Implement Workers of Am. v. Brock*, 477 U.S. 274, 281-82 (1986) (reciting and reaffirming the above-three part "*Hunt* test," which draws its name from *Hunt v. Washington Apple Advertising Comm'n*, 432 U.S. 333, 343 (1997)). The Court shall reserve discussion of the first condition of member standing for its examination of injury in fact and ripeness, *infra*. Where Plaintiff seeks to protect the HCR contracts of *its members* from termination, the Court finds that this interest is in fact germane to Plaintiff's purpose and that neither the claims themselves nor the relief requested requires the participation of the individual members in the lawsuit, whose interests, the Court finds, are adequately represented by Plaintiff organization.

Plaintiff cannot, however, establish representational standing for the holders of HCR contracts that are not members of the National Star Route Mail Contractors Association. The Court will not speculate as to why these non-member contract holders are not a part of Plaintiff Association or why they have not joined in this action with Plaintiff. Furthermore, Plaintiff has provided the Court with no basis upon which to conclude that it will "be able to represent adequately the interests" of these non-member contract holders. *Brock*, 477 U.S. at 290. Accordingly, the Court concludes that Plaintiff lacks standing with respect to the seventy-five

contracts provisionally identified by the Postal Service for termination and held by non-member contractors.

### 2. Injury in Fact and Ripeness

"Standing to sue is a doctrine rooted in the traditional understanding of a case or controversy." *Spokeo, Inc. v. Robins*, — U.S. —, 136 S. Ct. 1540, 1547 (2016), *as revised* (May 24, 2016). To establish standing, Plaintiff bears the burden of demonstrating that it "(1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Id.* (citing *Lujan*, 504 U.S. at 560-61). At the pleading stage, this requires Plaintiff to "'clearly . . . allege facts demonstrating' each element." *Id.* (quoting *Warth v. Seldin*, 422 U.S. 490, 518 (1975)).

The critical question in this case centers around injury in fact, which is the "'[f]irst and foremost'" element of standing. *Spokeo*, 136 S. Ct. at 1547 (quoting *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 103 (1998) (alteration in original)). "To establish injury in fact, a plaintiff must show that he or she suffered 'an invasion of a legally protected interest' that is 'concrete and particularized' and 'actual or imminent, not conjectural or hypothetical.'" *Id*. at 1548 (quoting *Lujan*, 504 U.S. at 560). "For an injury to be 'particularized,' it 'must affect the plaintiff in a personal and individual way.'" *Id*. (quoting *Lujan*, 504 U.S. at 560 n.1). For an injury to be "concrete," it "must be 'de facto'; that is, it must actually exist." *Id.* (quoting Black's Law Dictionary 479 (9th ed. 2009)). "Concrete" is not "necessarily synonymous with 'tangible,'" and can include the "risk of real harm." *Id*. at 1549. The standing analysis of a claim based on a "risk of real harm" is, of course, closely linked to the Court's ripeness inquiry. A claim is not ripe for adjudication "if it rests upon contingent future events that may not occur as anticipated, or indeed may not occur at all." *In re Aiken County*, 645 F.3d 428, 434 (D.C. Cir.

2011) (quoting *Devia v. NRC,* 492 F.3d 421, 424 (D.C. Cir. 2007) (internal citation and quotation marks omitted).

Plaintiff has not established that the risk of harm to its member contractors by the termination of their contracts is "actual or imminent, not conjectural or hypothetical." *Spokeo*, 136 S. Ct. at 1548 (internal citation and quotation marks omitted). The record before the Court "'fall[s] short of establishing certainly impending dangers for any particular member of the [Plaintiff's] association[ ].'" *Nat'l Ass'n of Home Builders v. E.P.A.*, 667 F.3d at 15 (quoting *Am. Chem. Council v. Dep't of Transp.*, 468 F.3d 810, 819 (D.C. Cir. 2006)). Examination of the facts, even as they have developed in the short period since Plaintiff filed this action, reveals that "deferring consideration might eliminate the need for review altogether." *Chamber of Commerce v. Reich*, 57 F.3d 1099, 1100 (D.C. Cir. 1995).

Plaintiff is concerned with protecting its members[6] from early termination of their HCR contracts by the Postal Service. The Arbitration Award, the Postal Service's decision not to seek to vacate the Award,[7] and the provisional identification by the Postal Service of 102 HCR routes "under consideration for conversion to PVS service"[8] underlie Plaintiff's concern. Although these considerations indeed show that the risk of injury to Plaintiff's members is not entirely abstract, Plaintiff's request is nonetheless premature. Plaintiff has not asked this court to enjoin the Postal Service from following through on the termination of HCR contracts for which it has already sent termination notices, but rather to seeks to *prevent* the Postal Service "from taking

---

[6] Having already found, *supra*, that Plaintiff lacks standing as to the non-member contractors, the Court shall confine its analysis to the twenty-seven contracts held by its members over which Plaintiff could assert representational standing if the individual members were able to establish standing.

[7] Marshall Letter.

[8] Dean Decl. ¶ 11; Pl. Mot. TRO & PI, Ex. 1, Att. C.

any action to implement the portion of the August 18, 2016[,] arbitration award that directs the Postal Service to Terminate up to 110 highway mail transportation routes currently served by contractors so that the routes may be served by Postal Service employees," Pl. Mot. for TRO & PI at 1. This request stands squarely at odds with the "basic rationale of the ripeness doctrine[, which] 'is to prevent the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements over administrative policies, and also to protect the agencies from judicial interference until an administrative decision has been formalized and its effects felt in a concrete way by the challenging parties.'" *In re Aiken County*, 645 F.3d at 433 (quoting *Abbott Labs. v. Gardner*, 387 U.S. 136, 148-49 (1967)).

On the record before this Court, it is ultimately uncertain whether the contracts held by any of Plaintiff's members will be terminated by the Postal Service. The language of the Arbitration Award itself and the December 7, 2016, Declaration of Rickey R. Dean, the Contract Administrator for the Postal Service for the National Agreement with the Union, lead the Court to conclude that the risk of harm to Plaintiff is no more than conjectural at this time. As discussed *supra*, the Arbitration Award provides the Postal Service with wide latitude to negotiate with the Union, to apply the Postal Reorganization Act's § 5005 public-interest analysis to identify which routes are best suited for conversion, to extend the timeframe for compliance with the Award, and to come back to the arbitrator to revisit the remedy if necessary. Arbitration Award at *20. Accordingly, the Postal Service has entered into negotiations with the Union "to determine the number of HCR routes that will ultimately be converted to PVS and which HCR Routes are most appropriate for conversion to PVS." Dean Decl. ¶ 10. Furthermore, Plaintiff's allegation that without action by this Court, the Postal Service will terminate the 102 HCR routes provisionally identified for termination by the Postal Service as indicated in its

October 18, 2016, letter[9] has already been shown to be incorrect. Since the creation of this list,

the Postal Service "has determined that approximately half of the routes on the list may not [be]

feasible to convert to PVS. The status of these routes and whether the routes will be substituted

with others are currently under negotiation with the APWU." Dean Decl. ¶ 11. To be sure, it is

entirely possible that some of the "approximately half of the routes" that remain under

consideration for conversion are currently served by HCR contractors who are members of

Plaintiff Association, but it is similarly possible that all twenty-seven routes held by members of

Plaintiff Association have now been deemed to be unsuitable for conversion, and, of course, it is

possible that the assessment is somewhere in between. This uncertainty as to whether any

members of Plaintiff Association will ultimately suffer injury requires this Court to find that this

injury is not sufficiently concrete to establish standing. Furthermore, in light of the continuing

negotiations and uncertainty as to what routes are most appropriate for conversion, the

imminence of the terminations has also been attenuated: "[i]t is unlikely that the Postal Service

will be able to issue termination notices for many (if not all) of the disputed HCR contracts

before December 19, 2016." *Id.* ¶ 13.

Plaintiff misreads the import of these factual developments in two ways relevant to the

Court's analysis of the justiciability of its claims. Citing the Dean Declaration, Plaintiff asserts

"[t]he Postal Service's papers show that it has not made a new § 5005(c) determination to justify

the planned conversion of HCR routes to PVS." Pl. Reply at 2. However, the Postal Service has

not yet made *any determination* as to possible conversion of HCR routes, but has continued its

assessment, and the Court presumes that this assessment has included § 5005 considerations.

Plaintiff further responds, "Fortunately, the Postal Service's opposition states it is unlikely to

---

[9] Corr. Compl. ¶ 15.

issue termination notices for many of the contracts in issue before December 19, 2016 . . . so the Court may issue injunctive relief that preserves the status quo." Pl. Reply at 12. This possible postponement of the issuance of termination notices, however, introduces another element of uncertainty into the Court's analysis. The imminence of the issuance of termination notices (if their issuance rather than termination itself is even the relevant triggering event, a question the Court need not reach) is also in question. This uncertainty precludes a finding that the Plaintiff has met its burden in establishing standing.

### B. Contract Disputes Act

Even if Plaintiff's claims satisfied the standing and ripeness requirements, the Court would still lack jurisdiction over this matter. Under the Contract Disputes Act, 41 U.S.C. § 7101 *et seq.* (previously codified at 41 U.S.C. § 601 *et seq.*), the Court of Federal Claims has *exclusive* jurisdiction over claims "founded upon an [ ] express or implied contract with the United States." *Ingersoll-Rand Co. v. U.S.*, 780 F.2d 74, 76 (D.C. Cir. 1985) (alteration in original). Like many cases where the federal district court's jurisdiction is challenged as precluded by the CDA, the determination of whether jurisdiction lies with the district court or in the Court of Federal Claims centers in this case around the question of whether the essential nature of the case is contractual. Although Plaintiff vigorously denies that its claims are essentially contractual, it implicitly concedes that if they are indeed characterized as such, exclusive jurisdiction over this action is vested in the Court of Federal Claims. Pl.'s Reply at 3. The Court concludes that Plaintiff's claims do indeed sound in contract and are subject to the Contract Disputes Act.

It is well settled that the Government has waived its immunity from suit against the Postal Service. The Postal Service is an "independent establishment" of the executive branch, 39 U.S.C. § 201, and the "sue and be sued" clause of the Postal Reorganization Act, waives the

Postal Service's immunity from suit. 39 U.S.C. § 401(1). *See U.S. Postal Serv. v. Flamingo Indus. (USA) Ltd.*, 540 U.S. 736, 744 (2004) (although finding ultimately that the Postal Service was not subject to the Sherman Act, holding that "[t]he sue-and-be-sued clause waives immunity, and makes the Postal Service amenable to suit, as well as to the incidents of judicial process"). The statute further provides that "except as otherwise provided in this title, the United States district courts shall have original but not exclusive jurisdiction over all actions brought by or against the Postal Service." 39 U.S.C. § 409(a). The question before this Court, then, is whether these claims raised by Plaintiff are among those over which the district courts have original jurisdiction.

Although the Postal Reorganization Act stands as a general grant of jurisdiction to the district courts over matters brought by or against the Postal Service, the Contract Disputes Act is "the paradigm of a 'precisely drawn, detailed statute' that preempts more general jurisdictional provisions." *A & S Council Oil Co., Inc. v. Lader*, 56 F.3d 234, 241 (D.C. Cir. 1995) (quoting *Brown v. GSA*, 425 U.S. 820, 834 (1976)). Accordingly, the Court of Appeals for the D.C. Circuit has recognized that the jurisdiction of the district courts is circumscribed by the Contract Disputes Act: "[W]e must implement the congressional intent to provide a single, uniquely qualified forum for the resolution of contractual disputes." *Ingersoll-Rand*, 780 F.2d at 74 (citing with approval the district court's dismissal of a breach of contract action against the Postal Service, having concluded that "the Contract Disputes Act pre-empts whatever jurisdiction this Court had in contract disputes with the Postal Service". *Prefab Products v. U.S. Postal Serv.*, 600 F. Supp. 89, 91-92 (S.D. Fla. 1984)). The court subsequently further explained, referring to and quoting its text, that the Contract Disputes Act:

> purports to provide a final and exclusive resolution of all disputes arising from government contracts covered by the statute. "All claims by a contractor against

the government relating to a contract" covered by the CDA must be submitted
first to the contracting officer for a decision. The contracting officer's decision on
the claim "shall be final and conclusive and not subject to review by any forum,
tribunal, or Government agency, unless an appeal or suit is timely commenced as
authorized by [the statute]. Such appeals may be made only to the appropriate
agency board of contract appeals or directly to the Court of Claims, but either
way, the next appeal lies only to the Federal Circuit.

*A & S Council Oil*, 56 F.3d at 241 (citations omitted). *See also Menominee Indian Tribe of Wisc.*

*v. United States*, 614 F.3d 519, 521 (D.C. Cir. 2010) ("The Contract Disputes Act of 1978 . . .

established a comprehensive framework for resolving contract disputes between executive

branch agencies and government contractors."). Accordingly, where the claims arise out of a

contract governed by the Contract Disputes Act, "the CDA limits adjudication of [that] dispute to

the Claims Court."[10] *Ingersoll-Rand*, 780 F.2d at 76.

      The jurisdictional bar of the Contract Disputes Act applies to claims arising from

contracts made thereunder by the Postal Service. In *Anselma Crossing, L.P. v. U.S. Postal Serv.*,

the Court of Appeals for the Third Circuit ("Third Circuit") carefully examined the jurisdictional

impact of the 2006 revisions to the Contract Disputes Act on cases involving claims relating to

contracts with the Postal Service. 637 F.3d 238, 242-46 (3rd Cir. 2011). The court noted the

ambiguity created by the amendments that simultaneously removed the Postal Service from the

definition of "executive agency" within the statute while also expressly adding jurisdictional

provisions governing the Postal Service Board of Contract Appeals. *Id.* at 244. *See* 41 U.S.C. §

7101(8) (previously codified at 41 U.S.C. § 601)(2)) (defining "executive agency"); 41 U.S.C. §

7105(e)(1)(C) (previously codified at 41 U.S.C. § 607(c)) (articulating the jurisdiction of the

Postal Service Board of Contract Appeals). The court, however, went on to explain that it was

---

[10] The "Claims Court," was renamed "Court of Federal Claims" by the Federal Courts
Administration Act of 1992. PL 102–572, Title IX, §902 October 29, 1992, 106 Stat 4506.

unnecessary to resolve this ambiguity, finding it conclusive that the Postal Reorganization Act "permits the USPS to adopt the CDA via its own internal regulations, *see* 39 U.S.C. § 410(a), and it has done so in 39 C.F.R. § 601.109." *Anselma Crossing*, 637 F.3d at 244. The court, therefore, concluded that the revisions to the Contract Disputes Act did not alter its applicability to contracts made by the Postal Service.

This Court finds the thorough and considered reasoning of the Third Circuit persuasive; the district court lacks jurisdiction over claims brought by or against the Postal Service related to contracts made pursuant to the Contract Disputes Act. *See Ansco, Hasler Mailing Sys., Inc. v. U.S. Postal Serv.*, Case Nos. 00-1401, 00-2089, 01-804, ECF No. 95, *3 (D.D.C. Sept. 27, 2007) (stating the general proposition that "[t]o the extent that plaintiffs' claims are 'related to' a contract within the scope of the CDA, jurisdiction over those claims lies not here but only in the Court of Federal Claims," but going on to find that the particular contracts were not procurement contracts subject to the CDA);[11] *Arbitraje Casa Cambio, S.A. v. U.S. Postal Serv.*, Case No. 02-777, 2004 WL 3257073, at *2-3, (D.D.C. Nov. 30, 2004) (finding that the district court lacked jurisdiction over the claims brought against the Postal Service that were essentially contractual

---

[11] Plaintiff relies upon, but reads too much from this case, which also involved contracts with the Postal Service. Although the court ultimately found that the Contract Disputes Act did not deprive it of jurisdiction, the court's jurisdiction was rooted in the particular nature of the contracts and the particularity of the types of contracts to which the Contract Disputes Act applies. There, the contracts were "not ones 'for the procurement of services'" and lacked the "hallmarks of a CDA contract." *Id.* at *4 (see discussion *infra* for further discussion of the hallmarks of CDA contracts). Despite the finding that the particular contracts at issue in that case did not fall under the Contract Disputes Act, the court accepted the general proposition relevant to the facts of this case: that "[t]o the extent that plaintiffs' claims are 'related to' a contract within the scope of the CDA, jurisdiction over those claims lies not here but only in the Court of Federal Claims." *Id.* at *3 (relying on *A & S Council Oil*, 56 F.3d at 240).

and governed by the Contract Disputes Act and accordingly transferring the case to the Court of

Federal Claims).[12]

The Court must next consider whether the contracts involved in this matter are of the

nature governed by the Contract Disputes Act. By its plain language, the CDA applies to "any

express or implied contract . . . made by an executive agency for . . . the procurement of

services." 41 U.S.C. § 7102(a)(2). Although the Court of Appeals for the Federal Circuit has

noted that this language of the CDA is "unambiguous," it has nonetheless stated that "[t]o

determine whether the applicability of the CDA to the pleaded contracts is within the intention of

Congress, we must look to the purpose of the Act and its legislative history." *Institut Pasteur v.

United States*, 814 F.2d 624, 627 (Fed. Cir. 1987). In so doing, it has identified certain

"hallmarks of a CDA contract," to which interpreting courts then look. *Ansco*, ECF No. 95 at *4

(quoting *Ervin & Assocs., Inc. v. United States*, 44 Fed. Cl. 646, 653 (1999)). These hallmarks

include "a buyer-seller relationship" between the parties, "a competitive bidding process," and

"the expenditure of government funds." *Ervin & Assocs.*, 44 Fed. Cl. at 653-54. The HCR

contracts at issue in this matter bear these hallmarks and thus fall squarely within the scope of

the Contract Disputes Act. The HCR contractors provide a service for the Postal Service,

pursuant to contracts that are to be awarded following a competitive bidding process, and

government funds pay for these services.

---

[12] The Court of Federal Claims subsequently found that the contracts at issue were not
procurement contracts governed by the Contract Disputes Act, but rather were governed by the
related Tucker Act and thus still within the exclusive jurisdiction of the Court of Federal Claims.
79 Fed. Cl. 235, 240 (2007). This contrary finding by the Court of Federal Claims as to the
nature of the contracts at issue in that case does not, however, call into question the proposition
that claims relating to contracts under the Contract Disputes Act are within the exclusive
jurisdiction of that court.

Furthermore, although the Court cannot be certain which, if any, of the HCR contracts that have been provisionally identified for termination will ultimately be terminated, the Court has reviewed the "[e]xample Terms and Conditions that apply to the HCR Contracts" provisionally identified for possible termination. USPS Opp'n, Ex. 2, ¶ 5 (Bridget M. Rice Decl.). The Terms and Conditions that governed the above-described HCR contracts, each contain a section entitled "Clause B-9 Claims and Disputes (March 2006)," which provides in pertinent part: "This contract is subject to the Contract Disputes Act of 1978 (41 U.S.C. 601-613[13]) ('the Act' or 'CDA'). Except as provided in the Act, all disputes arising under or relating to this contract must be resolved under this clause." USPS Opp'n, Ex. 2-I at *18; Ex. 2-J at *16; Ex 2-K at *16. These express provisions to the contracts make clear that they do indeed fall within the scope of the CDA.

The Court must next address whether Plaintiff's claims are properly construed as contract claims arising under these CDA contracts. Although Plaintiff styles its claims as raising questions of statutory and constitutional rights rather than as contract claims, "[c]ourts have not hesitated to look beyond the pleadings of a case brought in district court to determine if it involves a claim over which the Court of [Federal] Claims has exclusive jurisdiction." *Megapulse, Inc. v. Lewis*, 672 F.2d 959, 967 (D.C. Cir. 1982). "[A] plaintiff may not avoid the jurisdictional bar of the CDA merely by alleging violations of regulatory or statutory provisions rather than breach of contract." *Ingersoll-Rand*, 780 F.2d at 77. Rather, "the classification of a particular action as one which is or is not 'at its essence' a contract action depends both on the source of the rights upon which the plaintiff bases its claim, and upon the type of relief sought (or appropriate)." *Id*. at 76 (quoting *Megapulse*, 672 F.2d at 968).

---

[13] The Contract Disputes Act has been recodified at 41 U.S.C. § 7102 *et seq.*

The framework set out in *Ingersoll-Rand* for assessing whether an action essentially sounds in contract for purposes of determining whether claims fall under the exclusive jurisdiction of the Court of Federal Claims is particularly instructive here as plaintiff's claims and legal theories are closely analogous to those the D.C. Circuit considered in *Ingersoll-Rand*. There, the plaintiff-appellant sought reinstatement of a contract with the Air Force on the grounds that the termination of its contract violated two separate federal regulations and that resolicitation of bids on the contract would also violate federal regulations, all in contravention of the Administrative Procedures Act. 780 F.2d at 77. Although the plaintiff-appellant had attempted to "cast its complaint otherwise, [the court] conclude[d] that the essential rights at stake [t]here [were] contractual." *Id.* The court looked to three "essential aspects" of the claims before it, and the Court shall consider each aspect here as well.

First, the Court considers whether it is "possible to conceive of this dispute as entirely contained within the terms of the contract." *Ingersoll-Rand*, 780 F.2d at 78. In *Ingersoll-Rand*, the Air Force had invoked the termination-for-convenience clause contained in the contract at issue, which led the court to conclude that plaintiff-appellant "could thus challenge the termination based solely on contract principles. . . . The question presented by the complaint could be phrased as whether the contract forbids termination under these conditions." *Id.* (citation omitted). Similarly, the Plaintiff here anticipates that the Postal Service will invoke the termination for convenience or termination upon notice clauses that govern the HCR contracts before the court. *See* Corr. Compl. ¶ 25. *See also* USPS Opp'n at 3; *Id.* at Ex. 2, Att. A *17; *Id.* at Ex. 2, Att. B *28; *Id.* at Ex. 2, Att. E *30; *Id.* at Ex. 2, Att. F *27. Accordingly, just as in *Ingersoll-Rand*, Plaintiff's claims can be entirely reframed in contract terms. "That the termination also arguably violates certain other regulations does not transform the action into one

based solely on those regulations. Nor does plaintiff's decision to allege only a violation of the

regulations change the essential character of the action." *Ingersoll-Rand*, 780 F.2d at 78. Plaintiff

here alleges that for the Postal Service to implement the arbitration award, it would violate §

5005 of the Postal Reorganization Act because the arbitrator did not make a § 5005

determination regarding the HCR routes before him. This, however, mischaracterizes the nature

of the Award and the issue before this Court. The Arbitration Award presumes that the Postal

Service will conduct this analysis when deciding which contracts to terminate pursuant to its

rights under the HCR contracts. Additionally, the fact that Plaintiff here alleges both statutory

and constitutional violations[14] does not change the analysis. *See id.* (citing with approval *J.C.*

*Prods., Inc. v. United States*, 608 F. Supp. 92, 94 (W.D. Mich. 1984), for the proposition that

---

[14] While the Court shall not address Plaintiff's Fifth Amendment Due Process claim on the merits, the Court notes that the action contemplated by the Postal Service is the early termination of contracts, which, by their own terms to which the HCR contractors have agreed to be bound, provide for such termination. The contemplated action would not go further and "'bestow a badge of disloyalty or infamy' nor foreclose 'other employment opportunity.'" *Myers & Myers, Inc. v. U.S. Postal Service*, 527 F.2d 1252, 1258 (2d Cir. 1975) (citations omitted). Whereas the *de facto* debarment from government contracting that was at issue in *Myers & Myers* was found to implicate procedural rights of the contract-holders, the court explained that where, by contrast, there is no preclusion from future contracting opportunities, there is "no deprivation of 'liberty' which invokes the procedural safeguards of the Due Process clause." *Id.* (citations omitted). Rather, "[a] star route contractor cannot be said to hold a statutory entitlement to contract renewals or even a reasonable expectation that his business relationship with the Postal Service has become permanent in nature. In fact the clear intent of [39 U.S.C. §5005] was to maintain flexibility for the Postal Service in such arrangements by making the renewal decision a discretionary matter." *Id.* (citations omitted). Similarly, in *Seaboard World Airlines, Inc. v. Gronouski*, where the Postal Service had granted plaintiff, an international air carrier, the authority to transport certain mail items overseas, which in turn "developed into a $4 million business during the . . . five years" preceding the Postal Service's policy change that essentially "deprive[d] plaintiff of substantially all of its mail revenue," the court found that "plaintiff [did] not have a 'right' to carry the mail. Plaintiff is authorized to transport mail 'whenever required by the Postmaster General', 49 U.S.C. § 1371(l)." 230 F. Supp. 44, 46-48 (D.D.C. 1964). The court did find that there, "[h]owever, the plaintiff does have a right, conferred by Congress in the Administrative Procedure Act, to certain procedural safeguards before the Post Office can effect a new policy which so substantially affects the relationship between the carrier and the agency." *Id.* at 47. No such exceptional considerations arise under the facts that Plaintiff presents.

"where plaintiff was awarded contract and government terminated for convenience, cause of action is on the contract despite plaintiff's allegations of statutory and constitutional violations"). Furthermore, analysis of any termination of HCR contracts would not fall under the narrow set of cases where interpretation of the contract "will almost inevitably require construction and application" of specific statutory provisions over which the district court has exclusive jurisdiction. *Shaffer v. Veneman*, 325 F.3d 370, 372-73 (D.C. Cir. 2003) (finding the settlement agreement not to require statutory interpretation and distinguishing *Bd. of Trs. of Hotel and Rest. Emps. Local 25 v. Madison Hotel*, 97 F.3d 1479, 1485 (D.D.C. 1996), which did turn on the interpretation of ERISA rights that were incorporated into the settlement agreement, and over which provisions the district court had exclusive jurisdiction).

Having found that the dispute in this case can indeed be conceived of as entirely within the terms of the contract, the Court considers "whether the issues raised by [P]laintiff's complaint are within the unique expertise of the Court of [Federal] Claims." *Ingersoll-Rand*, 780 F.2d at 78. As discussed *supra*, the substance of Plaintiff's claims is that the Postal Service might improperly terminate HCR contracts, which were to have been secured according to a specified bidding. Just as in *Ingersoll-Rand*, therefore, this complaint "calls for knowledge of the government contracting process. In these circumstances, we must implement the congressional intent to provide a single, uniquely qualified forum for the resolution of contractual disputes." *Id.*

Finally, just as in *Ingersoll-Rand*, Plaintiff is not a "frustrated bidder," over whose "bid protest action" this court would retain jurisdiction. *Id.* at 78-79 (examining and distinguishing *Scanwell Labs., Inc. v. Shaffer*, 424 F.2d 859 (D.C. Cir. 1970)). This narrow class of cases involving the government contracting process over which the district courts do retain jurisdiction is limited to actions in which the plaintiff—who has no contract with the government—seeks a

declaratory judgment voiding the government award of the contract to the winning bidder. *Id*. By contrast, Plaintiff here "complains of [prospective] wrongful termination of its own contract with the government." *Id*. at 79. Finding these three factors as articulated in *Ingersoll-Rand* similarly conclusive as to Plaintiff's claims and with Plaintiff having suggested no other factors for the Court's consideration, the Court finds that the contracts, rather than the Postal Reorganization Act or the Fifth Amendment, are the source of the rights upon which Plaintiff bases its claims. *Megapulse*, 672 F.2d at 968.

The Court, therefore, turns to an examination of the second factor in the assessment of whether Plaintiff's claims should be properly construed as contract claims arising under CDA contracts: the nature of the remedy appropriate to Plaintiff's claims. *Id.* at 970-71. "Where the alleged damage is entirely due to and measured in reference to plaintiffs' performance of a contract, and is exclusively for money damages, plaintiffs' claim that the wrong originated in some statutory violation does not strip the case of its contractual character." *A & S Council Oil*, 56 F.3d at 241. Although Plaintiff here seeks injunctive relief to prevent the Postal Service from terminating HCR contracts, "plaintiff may not sidestep the restrictions of the CDA merely by avoiding a request for damages." *Ingersoll-Rand*, 780 F.2d at 79. Plaintiff's request is merely the preemptive (and, indeed, premature) iteration of the *Ingersoll-Rand* plaintiff's request that the district court order reinstatement of the original award of the government contract that it alleged the government had improperly terminated. *Id.* at 79-80. Just as the D.C. Circuit found there that the request amounted to a request for specific performance, the Court finds that Plaintiff's request here is a request for specific performance. *Id.* Plaintiff has made no effort to show that it would be unable to recover an appropriate damages remedy in the Court of Federal Claims for wrongful termination of the contract, and therefore has not shown that the relief available there

28

would be "inadequate." *Id.* at 80. To the extent that Plaintiff has argued that its members will be unable to recover for their financial losses if the contracts are terminated, this is not an argument that the remedies available to it in the Court of Federal Claims are inadequate, but rather is simply the consequence of the terms of the contracts to which the HCR contractors agreed. Where contracts are terminable upon notice or for convenience, as the contracts before the court indicate, the inability to recover payment of the full contract price following termination does not create jurisdiction in this Court. *See* Corr. Compl. ¶ 25. *See also* USPS Opp'n at 3; *Id.* at Ex. 2, Att. A *17; *Id.* at Ex. 2, Att. B *28; *Id.* at Ex. 2, Att. E *30; *Id.* at Ex. 2, Att. F *27. Rather, where the claims revolve around a contract governed by the CDA "a complaint involving a request for specific performance must be resolved by the [Court of Federal Claims]. . . . To hold that the CDA does not apply merely because, under that scheme, plaintiff cannot receive all its requested remedies, would intolerably upset the congressional purpose underlying the Act." *Ingersoll-Rand*, 780 F.2d at 80.

For all of the foregoing reasons, the Court finds that Plaintiff's claims sound in contract and are subject to the exclusive jurisdiction of the Court of Federal Claims. Because Plaintiff has failed to establish standing in this matter, which is not yet ripe for adjudication, the Court finds however, that it would not be in the interest of justice to, and accordingly shall not, transfer this matter to the Court of Federal Claims. 28 U.S.C. § 1631. *See Ingersoll-Rand*, 780 F.2d at 80-81.

## IV. CONCLUSION

Accordingly, the Court shall not reach the merits of Plaintiff's claims. *See Dominguez v. UAL Corp.*, 666 F.3d at 1361 (emphasizing the critical importance of jurisdictional analysis and the constitutional principle that where the court lacks jurisdiction over a matter, "'the courts have no business deciding it, or expounding the law in the course of doing so.'") (quoting

*DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 341 (2006)). The Court does not engage in the typical four-part analysis of whether a temporary restraining order should issue, because the Court lacks the authority to grant Plaintiff any such relief. Furthermore, the Court shall not opine on whether § 5005 of the Postal Reorganization Act creates a private right of action or whether the Norris-LaGuardia Act would bar the Court from awarding the injunctive relief requested by Plaintiff.

For all of the foregoing reasons, the Court finds that this action does not meet the justiciability requirements for this Court to exercise jurisdiction over the matter. Whereas Plaintiff lacks standing to bring these claims, which are not yet ripe for adjudication, and–to the extent that these claims may at some later time be brought–jurisdiction is vested in the United States Court of Federal Claims.

Lacking jurisdiction over the matter, the Court GRANTS Defendant's [14] and Intervenor's [15] Motion to Dismiss and DENIES Plaintiff's [6] Motion for Temporary Restraining Order and Preliminary Injunction as follows:

Plaintiff's claims are hereby dismissed WITH PREJUDICE in this court for lack of subject matter jurisdiction under the Contract Disputes Act; on this record, Plaintiff's claims as to contracts held by contractors who are *not* members of Plaintiff Association are dismissed WITH PREJUDICE for lack of standing. Plaintiff's claims, however, are dismissed WITHOUT PREJUDICE, insofar as Plaintiff shall not be barred by this Order from seeking relief in the proper forum should Plaintiff be able to establish standing in the future and if its claims become ripe for adjudication.

Finally the Court shall DENY WITH PREJUDICE in this court Plaintiff's Motion for Temporary Restraining Order and Preliminary Injunction, but Plaintiff shall not be barred by this Order from seeking such relief in the appropriate forum.

Because Plaintiff has failed to establish standing in this matter which is not yet ripe for adjudication, the Court finds that it would not be in the interest of justice and accordingly shall not transfer this matter to the Court of Federal Claims. 28 U.S.C. § 1631.

An appropriate Order accompanies this Memorandum Opinion.

/s/
COLLEEN KOLLAR-KOTELLY
United States District Judge